(No. 38091.—

CATERPILLAR TRACTOR Co., Appellee, *vs.* THE DEPARTMENT OF REVENUE, Appellant.

*Opinion filed November 26, 1963.*

WILLIAM G. CLARK, Attorney General, of Springfield, (WILLIAM C. WINES, THOMAS G. LYONS, EDWARD A. BERMAN, RICHARD A. MICHAEL, A. ZOLA GROVES, and RAYMOND S. SARNOW, Assistant Attorneys General, of counsel,) for appellant.

MCDERMOTT, WILL & EMERY, of Chicago, (HAMILTON SMITH, of counsel,) for appellee.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

The Department of Revenue of the State of Illinois taxed Caterpillar Tractor Company in four separate transactions under the Illinois Use Tax Act (Ill. Rev. Stat. 1961, chap. 120, par. 439.1 *et seq.*). Caterpillar obtained an injunction setting aside the tax money in a protest fund pending the outcome of this litigation. Caterpillar then filed a claim for credit with the Department of Revenue, and, after denial of its claim, filed an administrative review action in the circuit court of Cook County which cause was later transferred to Tazewell County. The circuit court of Tazewell County reversed the order of the defendant Department of Revenue and found each supplier was engaged in a service occupation. The Department has appealed directly to this court because the public revenue is involved.

The hearing before the Department of Revenue was had upon an agreed stipulation of facts detailing the four transactions in question. Since the Department's findings were based upon the stipulated facts and since the plaintiff brings these proceedings under the Administrative Review Act (Ill.

Rev. Stat. 1961, chap. 110, par. 264 *et seq.*), the trial court was reviewing the Department's conclusions of law rather than its finding of fact. Since the facts are not in dispute their legal effect becomes a matter of law reviewable by this court. Ill. Rev. Stat. 1961, chap. 110, par. 274; *Wallace* v. *Annunzio,* 411 Ill. 172; *Kensington Steel Corp.* v. *Industrial Com.* 385 Ill. 504, 509.

It was stipulated that the four transactions sought to be taxed by appellant, under the Use Tax Act, involved purchases by Caterpillar in 1957 and 1959 of a flat-top conveyor from Mechanical Handling Systems, Inc. of Detroit, Michigan (herein referred to as "Mechanical Handling"), a special three-position line index machine from Snyder Corp. of Detroit, Michigan, (herein referred to as "Snyder"), a scribe and mill fixture from Dearborn Tool and Die Company of Dearborn, Michigan, (herein referred to as "Dearborn"), and certain production pattern equipment from Annex Pattern Company of Detroit, Michigan, (herein referred to as "Annex"). Each of these purchases was made prior to the adoption of the Service Use Tax Act which became effective July 10, 1961. (Ill. Rev. Stat. 1961, chap. 120, par. 439.31 *et seq.*). Appellant claims each of these transactions to be taxable under the provisions of Rule 3 of the Retailers' Occupation Tax Rules and Use Tax Rule 11, both of the Department of Revenue. Rule 3 which covers the sellers of machinery, tools and the like provides:

"1. When liable for tax. Sellers of machinery, tools, dies, jigs, patterns, gauges and the like to users or consumers incur retailers' occupation tax liability except as specified in paragraph 2 hereof. This is true whether the seller installs such tangible personal property for the purchaser or not. (For information concerning the taxability of receipts from installation charges, see paragraph 4, g, of Article 3 of the retailers' occupation tax Rules and Regulations.) The seller is not exempt under paragraph 2 of this rule merely because he produces the tangible personal property, nor because he does not carry the tangible personal property in stock and

so produces it only upon receipt of an order therefor, nor because he alters a more or less standard type of tangible personal property to meet the particular needs of the purchaser. (For information concerning repair transactions, see Rule No. 10 of the retailers' occupation tax Rules and Regulations.)

"2. When not liable for tax. In a case in which the purchaser employs the seller primarily for his engineering or other scientific skill to design, develop, construct and produce a special machine, tool, die, jig, pattern, gauge or other similar items on special order for and to meet the particular needs of the purchaser, and in such a way that the item, when so produced, has use or value (other than salvage value) only to the purchaser and has use or value only for the specific purpose for which such item is produced by the seller for the purchaser, the seller is engaged primarily in a service occupation rather than in the business of selling tangible personal property and does not incur retailers' occupation tax liability."

It is conceded by the parties that section 3 of the Use Tax Act (chap. 120, par. 439.3) is applicable here insofar as it provides: "If the seller of tangible personal property for use would not be taxable under the Retailers' Occupation Tax Act despite all elements of the sale occurring in Illinois, then the tax imposed by this Act shall not apply to the use of such tangible personal property in this State."

In considering these questions, the following rule is applicable: "Taxing laws are to be strictly construed and they are not to be extended beyond the clear import of the language used. If there is any doubt in their application they will be construed most strongly against the government and in favor of the taxpayer." *Central Television Service, Inc.* v. *Isaacs,* 27 Ill.2d 420, 429, and cases there cited.

It was stipulated that the pattern equipment sold by Annex for $25,650 was used by Caterpillar in its own foundry to produce fly-wheel housings for its tractors. The pattern equipment was wholly designed by Caterpillar, and Annex constructed and produced this equipment on special order for, and to meet the particular needs of, Caterpillar, as reflected by its prints, and in such a way that the pattern equipment, when so produced, had use or value (other than salvage value) only to Caterpillar and only for the specific

purpose for which the pattern equipment was produced by Annex for Caterpillar.

It was further stipulated that the scribe and mill fixture purchased from Dearborn for $10,128 was intended to perform an operation in connection with the production of a power control clutch housing, a component of the Caterpillar tractor unlike the clutch housing produced by other manufacturers. The clutch housing itself is cast by a foundry which is one of Caterpillar's suppliers and the operation performed by the scribe and mill fixture is the last one performed on the casting at the foundry. Caterpillar furnished Dearborn one assembly drawing and 20 additional drawings showing details of the individual components of the fixture which it wanted Dearborn to build. These drawings were modified by Dearborn's engineers, and Dearborn constructed and produced a special fixture on special order for and to meet the particular needs of Caterpillar as shown on its drawings as modified by Dearborn's engineers, and in such a way that the fixture, when so produced, had use or value (other than salvage value) only to Caterpillar and only for the specific purpose for which the fixture was produced by Dearborn for Caterpillar. Caterpillar ordered and Dearborn built only one such scribe and mill fixture. Dearborn employs four engineers, each of whom is capable of designing a complete tool, and they contributed 80 hours time to modifying the Caterpillar drawings before production was commenced.

It was further stipulated that the three-position line index machine was purchased by Caterpillar from Snyder for $48,425. The purpose of this machine is to drill, chamfer, and tap Caterpillar parts which are track rollers for use in Caterpillar tractors and are unique with Caterpillar. Caterpillar employed Snyder primarily for its engineering and other scientific skill to design, develop, engineer and construct and produce a special machine tool on special order for and to meet the particular needs of Caterpillar, and in

such a way that the machine tool when so produced, had use or value only to Caterpillar, and had use or value only for the specific purpose for which the tool was designed by Snyder for Caterpillar. This was the only such machine built by Snyder for Caterpillar or anyone else.

According to the stipulation the flat-top conveyor which was 5 feet wide and 432 feet long was ordered by Caterpillar from Mechanical Handling on February 25, 1957; installation was completed in March of 1958, and Caterpillar paid $52,516, plus $14,000 for installation. Mechanical Handling was employed primarily for its engineering and other scientific skill to design, develop, engineer, construct and produce a special flat-top conveyor on special order for and to meet the particular needs of Caterpillar, and in such a way that the conveyor when so produced had use or value (other than salvage value) only to Caterpillar and had use or value only for the specific purpose for which the conveyor was designed by Mechanical Handling for Caterpillar.

The Department contends that because the Annex and Dearborn products were manufactured from Caterpillar engineered designs, with no modifications by Annex and only what are characterized as "minor changes" by Dearborn, both transactions are taxable under our holding in *Sterling Steel Casting Co.* v. *Dept. of Revenue,* 7 Ill.2d 244. There we held *Sterling* was not engaged in a service occupation in producing in volume relatively inexpensive steel castings, but rather was in the business of producing and selling tangible personal property at retail in which the element of service was incidental. We emphasized that *Sterling* rendered no engineering or technical service in *conceiving* or *designing* the castings produced by it, and that such technical skill as was involved related to production activity only. While appellee contends Annex engaged in a service occupation, having nothing to sell but its time and skill, when we look to the whole transaction, we find its sub-

stance to have been the patterns themselves, the end result of the services rendered by Annex. While this was custom work on special order, the unique characteristics of the equipment originated with the Caterpillar design which Annex executed. No additional design or engineering by Annex was required prior to production as in *American Brake Shoe Co.* v. *Department of Revenue,* 25 Ill.2d 354, 357, or in *Bucyrus-Erie Co.* v. *Lorenz,* 26 Ill.2d 183, 185. We therefore hold that Annex was here engaged in the business of selling tangible personal property at retail, and that the purchase by Caterpillar was taxable under the Use Tax Act.

However, the Dearborn transaction presents a different factual situation. In order to construct the machine desired by Caterpillar, it was apparent to Dearborn's engineers that substantial changes in design were necessary including locations, distances and dimensions. It therefore follows that the equipment as finally produced reflects a substantial engineering and design contribution by Dearborn, which holds itself out as a designer and builder of special machinery. See *Velten & Pulver, Inc.,* v. *Department of Revenue,* No. 37927.

In light of the foregoing, we believe the Dearborn transaction falls within our holding in *Ingersoll Milling Machine Co.* v. *Department of Revenue,* 405 Ill. 367, in that: "The primary occupation of appellee is that of furnishing a specially constructed machine on order produced through the technical engineering skill of the appellee for the purpose of doing a special job, and not merely a sale at retail of tangible personal property." (p. 373.) We therefore hold Dearborn to have been engaged in a service occupation and the purchase from it to be exempt from use tax.

The Snyder machine, by stipulation, had a combined salvage and scrap value equal to 19.92% of the total cost to Caterpillar. As we interpret paragraph 2 of the Department's Rule 3 the salvage value would have no bearing on

whether Snyder was exempt. It was stipulated that Caterpillar employed Snyder primarily for its engineering or other scientific skill to design, develop, engineer, construct and produce this special machine on special order to meet Caterpillar's particular needs, and in such a way that the machine when so produced had use or value only to Caterpillar and only for the special purpose for which the machine tool was designed. As Rule 3 is worded, whether or not the machine tool had salvage is immaterial. The rule merely requires that the machinery have no value *other than* salvage value to anyone but the customer for whom it is constructed. The stipulation brings the *Snyder* case squarely within the Department's rule as to exempt transactions, and we so hold.

The Department contends that since the conveyor sold by Mechanical Handling to Caterpillar was built almost entirely of standard and stock parts that this sale is taxable under the holding of this court in *Kellogg Switchboard and Supply Corp.* v. *Department of Revenue,* 14 Ill.2d 434. Of the total selling price of the conveyor of $52,516, $33,838 is attributable to materials and components of a stock or standard character, including $22,132 for raw steel. In *Kellogg,* the switchboard in question was found to have been fabricated almost entirely from stock parts and standard items which were not specifically and individually designed and engineered for use of the purchaser. We held the switchboard was not such an individual and specialized machine that it had no worth other than salvage to anyone else, and that the only special service in the transaction was the adaption of the switchboard to the local installation and that the switchboard itself, fabricated as it was of standard components, was held out for sale to all customers, and thus its sale was subject to tax. But the Department here has stipulated: "There is no practical way to attribute any salvage value to this conveyor. No one would have been willing to pay a price for the conveyor based on the prospect of dis-

assembling and salvaging standard components, or of modifying or readapting the conveyor * * * because the cost of disassembly would have exceeded the salvage recovery. * * * Hence, the only value that this conveyor would have had to anyone other than Caterpillar would have been scrap value. This conveyor weighed 104 tons. At $32 per ton, $3,328 could have been obtained for it in scrap value." We hold that this transaction falls squarely within the exemption provided in paragraph 2 of Rule 3 and that this transfer by Mechanical Handling to Caterpillar is not a sale at retail.

For the reasons above set forth, we affirm the judgment of the circuit court of Tazewell County as to the Dearborn, Snyder and Mechanical Handling transactions, and reverse the judgment as to the Annex sale and direct the trial court to confirm the finding of the Department of Revenue thereon.

*Affirmed in part, and reversed and remanded in part, with directions.*