SECOND DIVISION

FEBRUARY 8, 2000

No. 1-99-1670

In
 
re
 MARIA TOLEDO )   PETITION FOR REVIEW 

)   OF AN ORDER OF

)   THE HUMAN RIGHTS

(Maria Toledo, )   COMMISSION

)            

Petitioner-Appellant, )          

)   Charge No: 1990CF2049

v. )   EEOC No: 21B901054

)   ALS No: 8051

The Human Rights Commission and )

Westlake Community Hospital, ) 

) 

Respondents-Appellees). )

PRESIDING JUSTICE COUSINS delivered the opinion of the court:

The Department of Human Rights (the Department), on behalf of petitioner, Maria Toledo, filed a complaint with the Human Rights Commission (the Commission) against Westlake Community Hospital (the hospital), alleging national origin discrimination in violation of the Illinois Human Rights Act (775 ILCS 5/1-101 
et seq.
 (West 1994)).  After a four-day hearing, an administrative law judge (ALJ) issued his recommended order and decision, recommending that the complaint and underlying charge be dismissed with prejudice.  After declining to review the recommended decision and order of the ALJ, the Commission adopted the recommendation as its final administrative order.  On direct appeal, petitioner contends the Commission erred in concluding, as a matter of law, that the hospital articulated a legitimate, nondiscriminatory reason for its employment decision to discharge petitioner where the record contains no admissible evidence of articulation and where it was shown that the purported articulation was a pretext for unlawful discrimination based on national origin.

We affirm.

BACKGROUND

Petitioner, who was born and educated in Mexico, worked as a data entry/computer operator for the hospital from January 1978 to November 1989.  Petitioner was assigned to the second shift for the entire time she was employed by the hospital, working from 4 p.m. until 2:30 a.m.  As a computer operator, petitioner was responsible for entering data, running reports, supporting other computers users and monitoring computer services.  Petitioner would usually work by herself on the second shift; however, one day out of every two weeks she would be scheduled to work with another operator, Patricia Rich, who was not a member of any minority group.  Between 1978 and 1989, Nancy Abenanti, petitioner's immediate supervisor, gave petitioner reasonably favorable reviews regarding her work performance and recommended a series of raises.  To some extent, however, petitioner's performance reviews criticized her relationships with her coworkers, particularly Rich, as well as her attendance.

On November 2, 1989, petitioner was scheduled to work with Rich but was reportedly absent from her assigned desk for several hours.  Specifically, between 5 p.m. and the end of her shift, petitioner did not log onto the computer, enter any data, help Rich or remain available to perform her user-support responsibilities.  After receiving reports from three of petitioner's coworkers (Patricia Rich, Bart Costales and Yolanda Ong) that petitioner had been absent from her work station for several hours during her shift, Abenanti went to Dale Westcoat, Abenanti's supervisor, who instructed her to conduct an investigation, which included talking to all of the computer operators, except petitioner, about the allegations.

Upon interviewing Rich, Abenanti was informed that, on November 2, 1989, petitioner was absent from her work station from 5:30 p.m. to 10:30 p.m., and then went to and remained in Westcoat's office until 2:30 a.m.  Costales, who was Cuban and worked the third shift, informed Abenanti that petitioner was not present in the department between 9 p.m. and 10:30 p.m., and then went in Westcoat's office until about 2:30 a.m.  Ong, who was Filipino, informed Abenanti that the other operators had been talking about the fact that petitioner had been leaving the department.

While Abenanti exercised the discretion to determine whether any rule or regulation applied to the conduct of an employee, she did not have the authority to discharge an employee.  Therefore, on November 13, 1989, Westcoat and Abenanti arrived at the decision to discharge petitioner due to "neglect of duty" after meeting to discuss the investigation and review the computer logs indicating petitioner last signed onto the computer at 5:07 p.m.

On November 15, 1989, petitioner received her notice of discharge.

On January 19, 1990, petitioner filed a charge of national origin discrimination against the hospital with the Department. In her charge, petitioner alleged that, on November 15, 1989, the hospital discharged her from her position as a computer operator on the pretext that, on November 2, 1989, she was absent from her department for over three hours, but that the discharge had actually been motivated by discriminatory animus because of her Mexican origin.  See Ill. Rev. Stat. 1989, ch. 68, par. 2-102(A) (now 775 ILCS 5/2-102(A) (West 1998)).

On March 7, 1994, the Department filed a complaint with the Commission on behalf of petitioner.  See 775 ILCS 5/7A-102(F) (West 1994).  The complaint alleged, in pertinent part, that petitioner had been present at her work station for the required time on November 2, 1989, except for a scheduled meal break, and that the reason given by the hospital for her discharge was a pretext for unlawful discrimination based on her national origin.  See 775 ILCS 5/2-102(A) (West 1994).

On August 11, 1997, a four-day hearing commenced before an ALJ.  At the hearing, petitioner testified that, on November 2, 1989, shortly after 5 p.m., she logged off the computer and then told Rich that she was going to the cafeteria to get a soft drink.  Upon her return, at approximately 5:30 p.m., petitioner went into Westcoat's office to work on her own ideas for reducing down time and increasing productivity on the third shift.  Petitioner then took her lunch at 9 p.m., returning at or around 10 p.m.  Upon her return, she was seen by both Rich and Costales, but neither said anything to her indicating that they needed assistance in user support.  Thus, she returned to Westcoat's office to continue working on her project until the end of her shift, at 2:30 a.m.

Petitioner also offered testimony that Rich, Abenanti and Westcoat made comments to her that indicated their dislike of her due to her Mexican origin.  As to Rich, petitioner testified that Rich made over 500 anti-Mexican remarks over the course of her employment.  As to Abenanti, petitioner testified that Abenanti stated to her that she liked Mexican food, "but it was different working with one."  However, petitioner did not recall when the statement was made, what else was said or how many times Abenanti made the statement.  Petitioner also testified that Abenanti was consistently lenient with Rich when it came to matters of discipline and work.  As to Westcoat, petitioner testified that, during a phone conversation with her that took place between October 1989 and November 1989, Westcoat stated that he did not like "people like" petitioner.

Neither Rich nor Westcoat testified at the hearing; Rich was deceased and Westcoat was no longer employed by the hospital at the time of the hearing.  However, Abenanti admitted to telling petitioner that she liked Mexican food, but denied petitioner's allegation that Abenanti added the words "but working with you is different."  Abenanti further testified that the conversation took place when petitioner first started working at the hospital, during the time when she and petitioner were "just getting to know each other."

On December 18, 1998, the ALJ issued its 78-page "Recommended Order and Decision," finding that petitioner was successful in establishing, through indirect evidence, a 
prima facie
 case of national origin discrimination.  However, in that the hospital articulated a legitimate, nondiscriminatory reason for petitioner's discharge (
i.e.
, that it believed petitioner had abandoned her work station without permission from or notice to her supervisors), the ALJ found that petitioner failed to provide sufficient evidence that the articulated reason was a pretext for discrimination based on her national origin.  Specifically, the ALJ stated that petitioner failed to present "credible direct evidence" upon which it could be concluded that petitioner's national origin had influenced the discharge decision.  As such, the ALJ concluded that petitioner failed to prove by a preponderance of the evidence that the hospital discharged her because of her national origin and, therefore, it recommended that petitioner's complaint and the underlying charge before the Department be dismissed with prejudice.

On January 19, 1999, petitioner filed her objections to the ALJ's recommended order and decision.  Therein, she argued that no one other than the actual decision-maker should be allowed to articulate a legitimate reason for the discharge.  Thus, in the absence of testimony from Westcoat, the ALJ should have held, as a matter of law, that the hospital failed to articulate a legitimate, nondiscriminatory reason for the alleged action. Petitioner further alleged that the hospital could not have legitimately discharged her for neglect of duty as she had not, in fact, neglected any of her duties.

In its response, filed February 16, 1999, the hospital asserted that because Abenanti attended the meeting where the discharge decision was reached and because Larry Krueger, the information systems manager at the hospital, had been present when petitioner received her discharge notice, their testimonies at the hearing were sufficient to prove that a legitimate, nondiscriminatory reason existed for petitioner's discharge
. 
It further asserted that petitioner's exceptions did not show that the ALJ's refusal to find pretext was contrary to the manifest weight of the evidence
.

On April 23, 1999, the Commission notified the parties that a three-member panel had declined to review the recommended order and decision of the ALJ and, instead, adopted the recommended order and decision as its final order, thereby dismissing the complaint and underlying charge with prejudice.  See 775 ILCS 5/8A-103(E)(2) (West 1998).

On May 20, 1999, petitioner timely filed her petition for direct review of the final administrative order.  See 775 ILCS 5/8-111(A)(1) (West 1998).

OPINION

Upon judicial review of a final order of the Commission, the Commission's findings and conclusions on questions of fact are deemed 
prima facie
 true and correct (735 ILCS 5/3-110 (West 1998)) and "shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence" (775 ILCS 5/8-111(A)(2) (West 1998)); 
Zaderaka v. Illinois Human Rights Comm'n
, 131 Ill. 2d 172, 180, 545 N.E.2d 684, 688 (1989)
.  In order to set aside the Commission's findings as against the manifest weight of the evidence, the reviewing court must find that "no rational trier of fact, after viewing all of the evidence in a light most favorable to the agency, could have found as that agency did."  
Szkoda v. Human Rights Comm'n
, 302 Ill. App. 3d 532, 539, 706 N.E.2d 962, 968 (1998).  The reviewing court cannot reweigh the evidence, the credibility of witnesses or the reasonable inferences to be drawn from the evidence.  
Christ Hospital & Medical Center v. Human Rights Comm'n
, 293 Ill. App. 3d 105, 109, 687 N.E.2d 1090, 1093 (1997); 
Page v. City of Chicago
, 299 Ill. App. 3d 450, 464, 701 N.E.2d 218, 228 (1998).  Thus, if a review of the record reveals any evidence supporting the administrative agency's decision, the decision must be sustained.  
Interstate Material Corp. v. Human Rights Comm'n
, 274 Ill. App. 3d 1014, 1023, 654 N.E.2d 713, 719 (1995).

Initially, we address the Attorney General's contention that the Department should be dismissed from this appeal because it was neither the agency whose order is the subject of this appeal nor a party of record to the proceedings before the Commission.  The complaint before the Commission was filed by the Department, on behalf of petitioner, pursuant to the Illinois Human Rights Act (Act) (775 ILCS 5/7A-102(F) (West 1998)).  After the Commission rendered its final order, petitioner appealed to this court pursuant to section 8-111 of the Act (775 ILCS 5/8-

111(A)(1) (West 1998)), naming the hospital, the Commission and the Department as respondents.  Such petitions for review are governed by Supreme Court Rule 335 (155 Ill. 2d R. 335), which states that "the agency and all other parties of record shall be named respondents."  155 Ill. 2d R. 335.  In our view, whereas the Commission was the 
final
 decision maker who acted as the "administrative agency" whose order both affected "the legal rights, duties or privileges of parties" and terminated the proceedings before it (735 ILCS 5/3-101 (West 1998)), and whereas the Department was not a party of record to the proceedings before the Commission, the Department is dismissed from the appeal.  The caption of the appeal has been changed to reflect our decision pertinent to this issue.

As to the merits of petitioner's appeal, we note that in analyzing employment discrimination claims brought under the Act (775 ILCS 5/1-101 
et seq.
 (West 1998)), Illinois courts have routinely adopted the analytical framework set forth in United States Supreme Court decisions addressing claims brought under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e 
et seq.
 (1982)) and the Age Discrimination in Employment Act (29 U.S.C. §621 
et seq.
 (1982)), both of which prohibit employment discrimination on the basis of race, age, color, religion, sex or national origin.  In 
McDonnell Douglas Corp. v. Green
, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and 
Texas Department of Community Affairs v. Burdine
, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981), the Supreme Court refined its three-part burden of proof analysis to determine whether employment discrimination has occurred
.  See also 
Zaderaka
, 131 Ill. 2d at 178-79, 545 N.E.2d at 687.  Under the analysis, the employee must first establish a 
prima facie
 case of unlawful discrimination by a preponderance of the evidence.  
McDonnell
, 411 U.S. at 802, 36 L. Ed. 2d at 677-78, 93 S. Ct. at 1824.  If the 
prima facie
 case is established, a rebuttable presumption arises that the employer unlawfully discriminated against plaintiff.  
Zaderaka
, 131 Ill. 2d at 179, 545 N.E.2d at 687.  T
o rebut the presumption, the employer then must articulate, not prove (
Burdine
, 450 U.S. at 259-60, 67 L. Ed. 2d at 219, 101 S. Ct. at 1097), a "legitimate, nondiscriminatory reason" for the alleged discriminatory action.  
McDonnell
, 411 U.S. at 802, 36 L. Ed 2d at 678, 93 S. Ct. at 1824.  Specifically:

"[T]he defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.  The explanation provided must be legally sufficient to justify a judgment for the defendant.  If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity."  
Burdine
, 450 U.S. at 255, 67 L. Ed. 2d at 216, 101 S. Ct. at 1094-95.

See also 
United States Postal Service Board of Governors v. Aikens
, 460 U.S. 711, 715, 75 L. Ed. 2d 403, 410, 103 S. Ct. 1478, 1481-82 (1983).  Upon this "new level of specificity" (
Burdine
, 450 U.S. at 255, 67 L. Ed. 2d at 216, 101 S. Ct. at 1095), the presumption of discrimination "drops from the case" and the employee then must prove that the stated reason for the discharge was not the true reason, but was instead a pretext for unlawful discrimination.  
McDonnell
, 411 U.S. at 804, 36 L. Ed. 2d at 679, 93 S. Ct. at 1825; 
Zaderaka
, 131 Ill. 2d at 179, 545 N.E.2d at 687.  The employee can meet this "ultimate burden" of proving intentional discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  
Burdine
, 450 U.S. at 256, 67 L. Ed. 2d at 217, 101 S. Ct. at 1095; 
ISS International Service System, Inc. v. Human Rights Comm'n
, 272 Ill. App. 3d 969, 977, 651 N.E.2d 592, 597 (1995).  And, this burden of persuasion remains at all times with the employee.  
Zaderaka
, 131 Ill. 2d at 179, 545 N.E.2d at 687.

In 
order to establish a 
prima facie
 case of discrimination, petitioner must show: "(1) she is a member of a group protected by law; (2) she was treated in a certain manner by the employer; and (3) she was treated differently than similarly situated employees who are not members of the protected group."  
Motley v. Human Rights Comm'n
, 263 Ill. App. 3d 367, 372, 636 N.E.2d 100, 103 (1994).  Here, it is undisputed that petitioner has met her burden of proving a 
prima facie
 case of discrimination in that she was a member of a protected group and was discharged while a similarly situated, non-Mexican employee, Rich, was not discharged for being absent from her station on two separate occasions during her employ.  However, the ALJ ruled that the hospital articulated a legitimate, nondiscriminatory reason for petitioner's discharge that petitioner failed to rebut.  On appeal, however, petitioner contends that the hospital failed to meet its evidentiary burden of articulation where Westcoat, the person who made the decision to terminate petitioner, never testified at the hearing.  As such, petitioner asserts that the record contains no admissible evidence as to the hospital having articulated a legitimate, nondiscriminatory reason for its discharge of petitioner, relying on 
Valley Mould & Iron Co. v. Illinois Human Rights Comm'n
, 133 Ill. App. 3d 273, 478 N.E.2d 449 (1985), in support of this contention.

In 
Valley Mould
, the ALJ rejected the supervisor's testimony as "inadmissible hearsay" because it was "incoherent" and thus insufficient to satisfy the employer's burden to clearly state a legitimate, nondiscriminatory reason for the discharge.  (133 Ill. App. 3d at 285, 478 N.E.2d at 456).  In that case, the supervisor contradicted himself at the hearing, first saying that he discharged the plaintiff after talking to the foreman, then admitting that he did not talk to the foreman until after the discharge and, subsequently, coming up with a list of other reasons to support the discharge.  This court upheld the ALJ's determination that the supervisor failed to articulate a legitimate, nondiscriminatory reason for discharge, finding that the supervisor had simply "sought credible testimony to establish [the decision maker's] basis for recommending [the] discharge," but had failed to obtain it, and the resulting exclusion of the supervisor's testimony had not operated to place an improper burden on the employer.  
Valley Mould
, 133 Ill. App. 3d at 285, 478 N.E.2d at 456.

By contrast, in the present case there was no conflicting testimony.  The hospital's stated reason for discharging petitioner was that, following an investigation, the hospital determined that petitioner was absent without authorization from her department for five hours and that petitioner failed to perform her duties when she returned to the department after the five-hour absence.  The evidence presented at the hearing was that petitioner received a discharge notice stating that petitioner was discharged for "neglect of duty."  The discharge notice was admitted into evidence by petitioner.  Krueger testified to being present at the meeting where the discharge occurred and confirmed that petitioner was informed that the termination was for the reason stated on the notice.  Petitioner herself testified that she was informed that she was discharged for being absent from her work station for over three hours.  Costales, who was Cuban and worked the third shift, testified that petitioner was not present in the department between 9 p.m. and 10:30 p.m. and then went in Westcoat's office until about 2:30 a.m.  Abenanti testified that Westcoat instructed her to investigate the reports of petitioner's absence from the department and, after presenting her findings to Westcoat and reviewing the computer logs from that date, a decision was reached to terminate petitioner for "neglect of duty."

While neither Westcoat nor anyone with "decision-making authority" testified at the hearing regarding the reasons for the decision to discharge petitioner, 
any
 evidence supporting the administrative agency's decision will allow for the Commission's decision to be sustained.  
Interstate Material
, 274 Ill. App. 3d at 1023, 654 N.E.2d at 719.  In our view, the foregoing evidence allowed the trier of fact rationally to conclude that the hospital's employment decision had not been motivated by discriminatory animus.  
Burdine
, 450 U.S. at 257, 67 L. Ed. 2d at 218, 101 S. Ct. at 1096.  As such, we agree that the hospital carried its burden of production and, therefore, petitioner was then under a burden to prove that the hospital's articulated reasons were not the true reasons for her discharge, but were, instead, a pretext for discrimination.  
McDonnell
, 411 U.S. at 804, 36 L. Ed. 2d at 679, 93 S. Ct. at 1825; 
Zaderaka
, 131 Ill. 2d at 179, 545 N.E.2d at 687.

In this regard, petitioner contends that she was entitled to judgment in her favor because she demonstrated that the articulated reason for the employment decision to discharge was a pretext for unlawful discrimination based on national origin.  Specifically, petitioner avers that Rich made anti-Mexican remarks a great many times and that Abenanti and Westcoat were also against Mexicans, thereby urging this court to infer that petitioner's discharge must have been motivated by anti-Mexican sentiment.  However, after reviewing the evidence before it, the ALJ found that petitioner's assertions were unsupported by credible direct evidence.  In contradistinction, is was noted that: Abenanti permitted petitioner to take two Christmas vacations when no one else in the department was permitted to do so; Abenanti and Rich regularly deferred to petitioner's wish to take summertime vacations with her husband; Abenanti gave unrestrained praise of petitioner's performance in her annual evaluations; and Abenanti routinely gave petitioner above-minimum pay raises.

On the one hand, Abenanti was lenient toward Rich when it came to discipline for nonattendance-related conduct in that Rich received final warning notices because of her absences from the department and her work performance but was never discharged, while petitioner was discharged after only one absence from the department on November 2, 1989, and favorable work performance reviews.  On the other hand, the record evidences that Abenanti issued warning notices to petitioner at least five times before her discharge for her "pattern of weekend absences" and her working relationship with Rich.  Moreover, the ALJ found, and we agree, that evidence of leniency was "not enough":

"Without proof that their alleged offenses were equally serious and that [the hospital's] failure to view them as equally serious was unreasonable, or without evidence of a pattern of lenience towards Rich from which national origin discrimination can be inferred, [petitioner] has established, at best, favoritism without an apparent unlawful discriminatory animus.  The Act does not prohibit favoritism.  It prohibits favoritism 
because of
 national origin."  (Emphasis added.)

See, 
e.g.
,
 
International Brotherhood of Teamsters v. United States
, 431 U.S. 324, 335, 52 L. Ed. 2d 396, 415, 97 S. Ct. 1843, 1854 (1977) ("disparate treatment" means "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin").  The record fails to support the inference that Abenanti was consciously biased against petitioner 
because of
 her national origin.  Rather, none of the evidence to which petitioner points undercuts the good faith of the hospital's belief or, otherwise, tends to show that the stated reasons were pretextual.  
See 
Burdine
, 450 U.S. at 258, 67 L. Ed. 2d at 218, 101 S. Ct. at 1096.  As the ALJ observed:

"It is sufficient for employers to establish a good faith belief that the employee committed a disciplinary infraction.  This would be true even if it is later determined that such a belief was mistaken. [Citation].  Thus, for our purposes, it does not matter whether [petitioner] was actually out of the department from 5:30 p.m. to 10:30 p.m. or whether the [petitioner] was at her work station after 10:30.  It matters only that Abenanti believed this to be the case."

See, 
e.g.
, 
Jasmantas v. Subaru-Isuzu Automotive, Inc.
, 139 F.3d 1155, 1157 (7
th
 Cir. 1998).

In sum, whether an employer's articulated reason for a challenged action is pretextual is a question of fact to be properly decided by the trier of fact.  
Zaderaka
, 131 Ill. 2d at 180, 545 N.E.2d at 688.  As indicated above, upon judicial review of a final order of the Commission, the Commission's findings and conclusions on questions of fact are deemed 
prima facie
 true and correct (735 ILCS 5/3-110 (West 1998)) and "shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence" (775 ILCS 5/8-111(A)(2) (West 1998)).  After reviewing the evidence in the light most favorable to the agency, it is our view that the manifest weight of the evidence established that the hospital discharged petitioner because Abenanti reasonably believed that her conduct warranted immediate discharge and 
not
 because of her national origin.  Accord 
Zaderaka v. Illinois Human Rights Comm'n
, 131 Ill. 2d 172, 545 N.E.2d 684 (1989); 
Interstate Material Corp. v. Human Rights Comm'n
, 274 Ill. App. 3d 1014, 654 N.E.2d 713 (1995).  Accordingly, the decision of the Commission, dismissing petitioner's complaint and underlying charge with prejudice, is affirmed.

Affirmed.

McBRIDE and McNULTY, JJ., concur.